# United States Court of Appeals

### *for the*

# Fourth Circuit

---

MEGAN HEDGEPETH,

*Plaintiff/Appellant,*

— v. —

NASH COUNTY; NATALIE WEBB, in her individual capacity; and
MARY REEVES, in her individual capacity,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

## BRIEF OF APPELLEES

Nikole M. Crow
WOMBLE BOND DICKINSON (US) LLP
1331 Spring Street, N.W., Suite 1400
Atlanta, Georgia 30363-1017
(404) 872-7000 (Telephone)

*Counsel for Appellees*

Sonny S. Haynes
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
(336) 721-3632 (Telephone)

*Counsel for Appellees*

CP COUNSEL PRESS   (800) 4-APPEAL • (JOB 810897)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1638        Caption: Megan Hedgepeth v. Nash County, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mary Reeves
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sonny S. Haynes                     Date:        July 24, 2024

Counsel for: Appellees

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1638    Caption: Megan Hedgepeth v. Nash County, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Nash County
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sonny S. Haynes          Date:        July 24, 2024

Counsel for: Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1638 _____    Caption: Megan Hedgepeth v. Nash County, et al. _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Natalie Webb _____
(name of party/amicus)

_____

who is _____ Appellee _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                                - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sonny S. Haynes                    Date:      July 24, 2024

Counsel for: Appellees

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................iv

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................4

    A.    Statement of Facts Relevant to the Issues Submitted for
           Review .....................................................................................4

    B.    Course of Proceedings and Disposition in the Court Below...............10

          (1)    The District Court's Application of the Summary
                 Judgment Standard.................................................12

          (2)    The District Court's Analysis of Hedgepeth's
                 Procedural Argument. ..............................................14

          (3)    The District Court's Analysis of Hedgepeth's Federal
                 Claims Based on Arrest and Prosecution...................................14

          (4)    The District Court's Analysis of Hedgepeth's
                 Procedural Due Process Claim....................................15

          (5)    The District Court's Analysis of Hedgepeth's Race and
                 Sex Discrimination Claims. .....................................15

          (6)    The District Court's Analysis of Hedgepeth's *Monell*
                 Claim. ..........................................................16

           (7)    The District Court's Analysis of Hedgepeth's State
                 Law Claims. ..................................................17

               (a)    Malicious Prosecution and Abuse of Process.................17

               (b)    Infliction of Emotional Distress .....................17

               (c)    Public Official and Governmental Immunity.................18

SUMMARY OF THE ARGUMENT .......................................................19

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................20

    A.    Standard of Review ..........................................................20

B.      The district court correctly granted summary judgment on Hedgepeth's federal arrest and prosecution claims because there is no genuine issue of fact that Ms. Webb violated Hedgepeth's constitutional rights ........................................................ 25

C.      The district court properly dismissed federal arrest and prosecution claims against Ms. Reeves as a matter of law ................ 29

D.      The district court correctly held Ms. Webb had qualified immunity from Hedgepeth's federal arrest and prosecution claims because Hedgepeth did not establish violation of a clearly established right ........................................................ 30

E.      The district court correctly granted summary judgment on Hedgepeth's procedural due process claims because she failed to demonstrate a genuine issue of fact that she was deprived of a meaningful opportunity to be heard at an appropriate time .................................................................... 33

F.      The district court correctly granted summary judgment on Hedgepeth's race and sex discrimination claims because she offered no evidence that decisionmakers were motivated by race or sex or that she was treated different that similarly situated individuals .......................................................... 36

G.      The district court correctly granted summary judgment to Nash County on Hedgepeth's *Monell* claim because there was no underlying constitutional violation and no evidence of policies, customs, or a pattern of violations which deprived her of her rights .................................................................. 39

H.      The district court correctly granted summary judgment on Hedgepeth's state law malicious prosecution and abuse of process claims because there was probable cause for her arrest ................................................................................. 40

I.      The district court correctly granted summary judgment on Hedgepeth's intentional and negligent infliction of emotional distress claims because she offered no evidence of extreme or outrageous conduct, resulting damages, or malice sufficient to overcome public official immunity .................................................... 42

CONCLUSION ........................................................................... 45

STATEMENT REGARDING ORAL ARGUMENT ..............................................45

CERTIFICATE OF COMPLIANCE.......................................................................47

CERTIFICATE OF FILING AND SERVICE .......................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................... 13, 21

*Barnette v. Woody*,
242 N.C. 424, 88 S.E.2d 223 (1955) ...................................... 41, 42

*Beroth Oil Co. v. Whiteheart*,
173 N.C. App. 89, 618 S.E.2d 739 (2005) ...................................41

*Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,
520 U.S. 397 (1997)....................................................................40

*Bratcher v. Pharm. Prod. Dev., Inc.*,
545 F. Supp. 2d 533 (E.D.N.C. 2008) ...................................... 42, 43

*Carr v. Deeds*,
453 F.3d 593 (4th Cir. 2006) ........................................................20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................ 13, 20

*Dickens v. Puryear*,
302 N.C. 437, 276 S.E.2d 325 (1981) ........................................43

*Durham v. Horner*,
690 F.3d 183 (4th Cir. 2012) ........................................................41

*Emmett v. Johnson*,
532 F.3d 291 (4th Cir. 2008) ........................................................20

*English v. Clarke*,
90 F.4th 636 (4th Cir. 2024) ........................................................25

*Evans v. Chalmers*,
703 F.3d 636 (4th Cir. 2012) ................................................ 25, 26

*Fowle v. Fowle*,
263 N.C. 724, 140 S.E.2d 398 (1965) ........................................41

*Francis v. Booz, Allen & Hamilton, Inc.*,
452 F.3d 299 (4th Cir. 2006) ........................................................20

iv

*Glynn v. EDO Corp.*,
710 F.3d 209 (4th Cir. 2013) ........................................................................20

*Goldberg v. Kelly*,
397 U.S. 254 (1970)........................................................................34

*Gustafson v. Jones*,
117 F.3d 1015 (7th Cir. 1997) ........................................................................40

*Harris v. Town of S. Pines*,
110 F.4th 633 (4th Cir. 2024) ........................................................ 32, 33

*Hewes v. Wolfe*,
74 N.C. App. 610, 330 S.E.2d 16 (1985) ........................................................42

*Holman v. Block*,
823 F.2d 56 (4th Cir. 1987) ........................................................ 34, 35, 36

*Humbert v. Mayor & City Council of Baltimore City*,
866 F.3d 546 (4th Cir. 2017) .................................................... *passim*

*Lovelace v. Sherwin-Williams Co.*,
681 F.2d 230 (4th Cir. 1982) ........................................................ 13, 38

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................13

*McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*,
780 F.3d 582 (4th Cir. 2015) ........................................................................38

*McTique v. City of Chicago*,
60 F.3d 381 (7th Cir. 1995) ........................................................................39

*Miller v. Prince George's Cnty.*,
475 F.3d 621 (4th Cir. 2007) ........................................................ 30, 31, 32

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)....................................................... *passim*

*Myrick v. Prime Ins. Syndicate, Inc.*,
395 F.3d 485 (4th Cir. 2005) ........................................................................13

*Our Children v. School Bd. of Broward Cnty, Fla.*,
193 F.3d 1285 (11th Cir. 1999) ........................................................................37

*Quarles v. Weeks*,
815 F. App'x 735 (4th Cir. 2020)........................................................................41

*R.A. v. Johnson*,
  36 F.4th 537 (4th Cir. 2022) ........................................................... 44

*Safar v. Tingle*,
  859 F.3d 241 (4th Cir. 2017) .......................................................... 30

*Thurston v. Frye*,
  99 F.4th 665 (4th Cir. 2024) ........................................................... 25

*United States v. Diebold, Inc.*,
  369 U.S. 654 (1962) ......................................................................... 13

*Waddle v. Sparks*,
  331 N.C. 73, 414 S.E.2d 22 (1992) ................................................ 43

*Westmoreland v. TWC Admin. LLC*,
  924 F.3d 718 (4th Cir. 2019) .......................................................... 36

**Statutes & Other Authorities:**

U.S. Const. amend. IV ................................................................ *passim*

U.S. Const. amend. V ................................................................... 10, 11

U.S. Const. amend. XIV ............................................................. 10, 11

7 U.S.C. § 2011 ................................................................................. 34

42 U.S.C. § 1981 ............................................................................... 10

42 U.S.C. § 1983 .......................................................... 10, 11, 25, 39

E.D.N.C. Local Civil Rule 56.1(a)(2) ........................................... 25

Fed. R. App. P. 34(a)(2)(C) ............................................................ 45

Fed. R. Civ. P. 12(b)(6) ................................................................... 38

Fed. R. Civ. P. 56(a) ........................................................................ 12

## STATEMENT OF JURISDICTION

Nash County, Natalie Webb in her individual capacity ("Ms. Webb"), and Mary Reeves in her individual capacity ("Ms. Reeves") adopt the statement of jurisdiction submitted by Appellant Megan Hedgepeth ("Hedgepeth").

# STATEMENT OF THE ISSUES

(1)     Did the district court correctly grant summary judgment on Hedgepeth's federal claims based on arrest and prosecution because she failed to demonstrate a genuine issue of fact that Ms. Webb violated her constitutional rights by causing a false arrest or malicious prosecution?

(2)     Did the district court correctly dismiss Hedgepeth's federal claims based on arrest and prosecution against Ms. Reeves as a matter of law because Ms. Reeves was not involved in the decision to seek a warrant for Hedgepeth's arrest?

(3)     Did the district court correctly hold Ms. Webb was entitled to qualified immunity from Hedgepeth's federal claims based on arrest and prosecution because Hedgepeth did not establish the violation of a clearly established right?

(4)     Did the district court correctly grant summary judgment to Nash County, Ms. Webb, and Ms. Reeves on Hedgepeth's procedural due process claims because Hedgepeth had no right to an evidentiary hearing prior to reduction of food stamp benefits and therefore failed to demonstrate a genuine issue of fact that she was deprived of a meaningful opportunity to be heard at an appropriate time?

(5)     Did the district court correctly grant summary judgment to Nash County, Ms. Webb, and Ms. Reeves on Hedgepeth's race and sex discrimination claims because she offered no evidence that decisionmakers were motivated by race or sex, or that she was treated differently than similarly situated individuals?

(6)   Did the district court correctly grant summary judgment to Nash County on Hedgepeth's *Monell* claim because (a) she failed to show any underlying constitutional violation; and (b) she offered no evidence that Nash County had a policy, custom, or practice of violations which deprived her of her constitutional rights?

(7)   Did the district court correctly grant summary judgment on Hedgepeth's state law malicious prosecution and abuse of process claims because there was probable cause for her arrest?

(8)   Did the district court correctly grant summary judgment on Hedgepeth's intentional and negligent infliction of emotional distress claims because she offered no evidence of extreme or outrageous conduct and resulting damages, and she offered no evidence of malice sufficient to overcome public official immunity?

## STATEMENT OF THE CASE

### A.     <u>Statement of Facts Relevant to the Issues Submitted for Review</u>

This case involves various claims by Hedgepeth that the Nash County Department of Social Services ("NCDSS") and/or its employees denied her due process during recertification of her food stamp eligibility in June 2018. *See generally* (JA9-31). She also claimed discrimination and denial of due process and equal protection in connection with the NCDSS investigation into referrals from outside sources who provided information that she intentionally and fraudulently violated food stamp program eligibility requirements by providing false information about her household composition and income. *See generally* (JA9-31).

Hedgepeth identifies as Native American on her birth certificate, but she is not affiliated with a tribe. (JA122). When completing paperwork, she identifies as Black because she has "Black in [her] family" and she is "not into the Indian lifestyle." (JA122-123).

The physical address of her current home is 8163 Medoc Mountain Road, Hollister, North Carolina 27844, which she has rented from her mother's sister, Joyce Tillery, since around May of 2018, pursuant to a written lease agreement. (JA86, JA88, JA98, JA102-104.). However, she does not have a mailbox, so she receives mail at the address of her father, Robbie Hedgepeth, which is 8185 Medoc Mountain Road. (JA96-97). According to Hedgepeth, 8201 Medoc Mountain Road

was the address of her great-great aunt until she passed away in 2009 or 2010. (JA146). No one has lived there since, but her great-great aunt's daughter (Kelly Redcross) asked Robbie Hedgepeth to "keep an eye on the property." (JA146-147). Hedgepeth denies ever living at 8201 Medoc Mountain Road or receiving mail there. (JA99).

Prior to moving to 8163 Medoc Mountain Road, Hedgepeth lived with her mother, Pamela Hedgepeth, at 4463 Womble Road in Nashville, North Carolina. (JA86-88, JA91-93). In 2018, Hedgepeth moved from the Womble Road address because the house was foreclosed. (JA87).

Hedgepeth has three children: D.W., L.B., and H.B. (JA87-88). All three children live with her. (JA88). The father of her two daughters, L.B. and H.B., is Taiwado Brown. (JA93). Hedgepeth was in an "on and off" relationship with Mr. Brown from 2011 or 2012 until 2018 or 2019. (JA94-95). Hedgepeth initially stated Mr. Brown's current address is 1665 Debsan Circle, Greenville, North Carolina, but later said she was not sure of his actual address because they meet to exchange the kids for visitation, but she does not "get into his personal life." (JA94, JA147-148).

Hedgepeth was last employed in approximately 2021 as a patient care assistant for Trinity Villas in Nashville, North Carolina. (JA104-106). She was not employed as of the date of her deposition on November 21, 2022. (JA104).

According to Hedgepeth, she began receiving food stamps at age 21, while still living with her mother. (JA108-109).

Before she moved from Nashville to Hollister, Hedgepeth came under investigation in connection with her food stamps by Income Maintenance Fraud Investigator Natalie Webb. (JA99-100, JA327). Ms. Webb worked for the NCDSS from 1987 until her retirement in December 2018. (JA325, JA328, JA433). At all times relevant to Hedgepeth's Complaint, Ms. Webb's supervisor was Paula Person. (JA433) As one of two investigators within the Program Integrity Department of NCDSS, Ms. Webb was responsible for investigating referrals for alleged fraud related to any program for which NCDSS offered services. (JA433). The referrals came from both inside and outside sources and were documented and sent to Ms. Person who then assigned them to an investigator. (JA433) Ms. Webb primarily investigated food stamp referrals, but if the client also received Medicaid or other benefits (such as day care assistance), she would investigate related to those benefits as well. (JA433). Her primary role was to investigate whether fraud referrals were substantiated or unsubstantiated. (JA433)

In or around May 2018, NCDSS received an anonymous referral about Hedgepeth's food stamp benefits. (JA434). The anonymous caller reported that Hedgepeth did not live in Nash County but was living in Halifax County with Mr. Brown. (JA434) Mr. Brown was not listed as a resident of Hedgepeth's Nash County

home and his income was not being considered for the purposes of calculating her monthly food stamp benefits from NCDSS. (JA434)

When Ms. Webb received the referral, she established the file, reviewed program records, and started an investigation to determine who lived in the household so that Hedgepeth's monthly benefits could be calculated accurately. (JA434).

NCDSS sent Hedgepeth a Notice requesting information about where she lived and the individuals living in her home. (JA434). Following receipt of the Notice, Hedgepeth reported she no longer lived in Nash County, but was renting a residence from her aunt in Halifax County and provided a copy of the lease. (JA434) In or around June 2018, Ms. Webb closed the fraud investigation after Hedgepeth provided the updated address in Halifax County and both her parents reported she was living with her children only. (JA434)

After Ms. Webb closed the initial fraud investigation, NCDSS received another report from a retired officer of the North Carolina State Highway Patrol that Mr. Brown was living with Hedgepeth in Halifax County. (JA304, JA434). Ms. Webb subsequently spoke with Hedgepeth's uncle, who confirmed that Mr. Brown lived with Hedgepeth in Halifax County and had been for at least five years. (JA304, JA435). Based on this additional information, Ms. Webb reopened the fraud investigation. (JA435).

Ms. Webb's investigation into Hedgepeth's case included requesting that the post office verify who receives mail at the address; checking information recorded with the North Carolina Division of Motor Vehicles, the Social Security Administration, and the Employment Security Administration; and obtaining information from school systems, banks, an insurance company, and social media. (JA435). Ms. Reeves, the NCDSS Food Stamp Supervisor, was not involved in the fraud investigation once she realized that she knew Hedgepeth's landlord. (JA429-430).

Ms. Webb's fraud investigation included attempting to speak with Hedgepeth. (JA435). Hedgepeth was uncooperative and declined to speak with Webb one-on-one. (JA435) During the investigation, using the available resources and case file information, Ms. Webb collected enough evidence to substantiate the allegation that Mr. Brown was living in the Halifax County residence with Hedgepeth and her children. (JA435) As a result, an overpayment of benefits had been issued to Hedgepeth based on her failure to report that Mr. Brown was residing in the home. (JA435) When Mr. Brown's income was counted in the household, Hedgepeth's monthly food stamp benefits decreased. (JA198).

Hedgepeth appealed the reduction of her benefits at a hearing before the North Carolina Department of Health and Human Services ("NCDHHS"). (JA198-200). The issue at the appeal hearing was:

> Whether Appellee's [NCDSS] determination that the Appellant lived with the father of her children and his income should be counted in the household income for Food and Nutrition Services (FNS) benefits and thus benefits would decrease was correct?

(JA198). Each of the regulations cited by the State Hearing Officer refer to Hedgepeth's eligibility for benefits. (JA199). The hearing decision was limited to the issue of whether Hedgepeth's benefits should have been reduced, which is underscored by the State Hearing Officer's conclusion that NCDSS' decision to reduce Hedgepeth's benefits to $364 was not supported by the evidence. (JA200). The State Hearing Officer's decision to remand the matter to NCDSS "to reassess [Hedgepeth's] allotment and issue a new recertification determination decision" (JA200) in no way related to the pending fraud investigation being conducted by Ms. Webb, and the evidence from the fraud investigation was not presented at the hearing. (JA199).

NCDSS appealed the State Hearing Officer's decision. (JA449). An Appeal Summary dated September 21, 2018, stated:

> [Food and Nutrition Services] was waiting for clarification from Program Integrity at the state level to see what documentation and verification could be provided to the Hearing Officer due to open on-going investigation. We never heard back from Program Integrity on what could and couldn't be provided as verification to the Hearing Officer.

(JA450). Thus, none of the information being gathered by Ms. Webb was provided at either of the two benefits eligibility hearings before the NCDHHS.

Following the second hearing, NCDHHS affirmed the decision to reinstate Hedgepeth's benefits. (JA15). Ms. Webb was not present at either of the eligibility hearings and the outcomes were unrelated to her fraud investigation. (JA436). The purpose of the food stamp eligibility hearings was to determine Hedgepeth's eligibility to receive benefits, not to determine whether Hedgepeth committed fraud. (JA436).

Based on Ms. Webb's substantiation of the fraud allegations, Ms. Webb typed the relevant information into a criminal warrant for food stamp fraud and presented it to a magistrate. (JA435). The magistrate signed the warrant after finding probable cause. (JA435)

In October 2018 after criminal proceedings were initiated based on the substantiated allegations of fraud, Ms. Webb prepared a Superior Court Summary that included the details of her investigation and listed 28 separate items of documentary evidence to support the criminal charge of felony food stamp fraud. (JA435, JA438-442). However, after December 2018, Ms. Webb retired and was no longer involved in Hedgepeth's case. (JA436).

**B.     Course of Proceedings and Disposition in the Court Below**

Hedgepeth brought this action on October 1, 2021, asserting (1) violations of 42 U.S.C. §§ 1981 and 1983 (JA18-22); (2) violations of her Fifth and Fourteenth Amendment due process rights (JA22-24); (3) violation of her Fourteenth

Amendment equal protection rights (JA24); (4) malicious prosecution (JA25-26); (5) abuse of process (JA26-27); and (6) intentional and negligent infliction of emotional distress (JA27-29). Nash County, Ms. Webb, and Ms. Reeves submitted their answer and affirmative defenses on December 10, 2021. (JA32-48).

Following discovery, Nash County, Ms. Webb, and Ms. Reeves moved the district court for summary judgment on all of Hedgepeth's claims. (JA49-50). For grounds, Nash County, Ms. Webb, and Ms. Reeves demonstrated: (1) Hedgepeth's *Monell* claim failed as a matter of law because she did not identify any policy, custom, or practice of Nash County to deprive citizens of constitutional rights (JA57); (2) Hedgepeth's section 1983 malicious prosecution claim failed because the intervening act of a neutral magistrate signing the warrant based on probable cause was a superseding cause that shielded Ms. Reeves and Ms. Webb from liability (JA57-58); (3) Hedgepeth's testimony provided no evidence of race or sex discrimination either against Hedgepeth or any other individual (JA58); (4) Hedgepeth was not denied Fourteenth Amendment due process rights because she was notified that the issue regarding Mr. Brown residing in her home needed to be resolved, was permitted to present evidence and rebut adverse witnesses, and was afforded the right to appeal the reduction of benefits to the NCDHHS (JA58-59); (5) Hedgepeth's Fifth Amendment claim failed as a matter of law because Nash County, Ms. Webb, and Ms. Reeves are not federal actors (JA59-60); (6) Ms. Reeves and

Ms. Webb are entitled to qualified immunity from Hedgepeth's federal claims (JA60-61); (7) Hedgepeth's state law claims against Nash County were barred by the governmental immunity doctrine (JA61-63); (8) Hedgepeth's state law malicious prosecution claim failed because probable cause existed for her arrest (JA63-64); (9) Hedgepeth's state law abuse of process claim failed because she did not prove any ulterior purpose to pursue the criminal charge based on substantial evidence of food stamp fraud and she did not prove Ms. Webb committed a willful act to gain advantage over Hedgepeth in a collateral matter (JA64-65); (10) Hedgepeth's intentional and negligent infliction of emotional distress claims failed because she proffered no evidence of extreme or outrageous conduct, no evidence that Nash County, Ms. Webb, and Ms. Reeves acted negligently in any way, and no evidence she suffered severe emotional distress (JA65-66); and (11) Hedgepeth's state law claims against Ms. Reeves and Ms. Webb are barred by public official immunity. (JA66-67). The district court properly granted the summary judgment motion of Nash County, Ms. Webb, and Ms. Reeves as to all of Hedgepeth's claims by order and judgment dated June 16, 2024. (JA528-548).

### (1) The District Court's Application of the Summary Judgment Standard.

In determining whether summary judgment should be granted, the district court set forth the proper standard of review under Fed. R. Civ. P. 56(a) (*i.e.*, movant shows no genuine dispute about any material fact and entitlement to judgment as a

matter of law). (JA533). The district court properly noted that Nash County, Ms. Webb, and Ms. Reeves had the initial burden of identifying the basis for the motion and the record evidence establishing the absence of a genuine issue of material fact. (JA533) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). However, the district court went on to correctly state that, once they met that burden, Hedgepeth was required to "come forward with specific facts showing that there is a genuine issue for trial," and that only disputed facts which could affect the outcome of the case could preclude summary judgment. (JA533-534) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). While the district court was cognizant that any *evidence* Hedgepeth presented should be believed and *justifiable* inferences should be drawn in her favor, the court likewise accepted that "permissible inferences must still be within the range of reasonable probability" and that district courts have a duty to grant summary judgment "when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." (JA534) (citing *Anderson*, 477 U.S. at 255, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982), and *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005)).

### (2) The District Court's Analysis of Hedgepeth's Procedural Argument.

Although she has not expressly presented it as an issue in this appeal, Hedgepeth refers to purported default and delay she attributed to Nash County, Ms. Webb, and Ms. Reeves in her argument to the district court. (Appeal: 24-1638, Doc: 15, p. 24). The district court properly rejected Hedgepeth's meritless arguments that summary judgment should be denied based on the alleged failures of Nash County, Ms. Webb, and Ms. Reeves to timely respond to her Complaint, "to litigate the matter on multiple occasions such that there should be a trial by default," and "to make any effort to prosecute their case after a protective order was entered on May 16, 2023." (JA534-535) (cleaned up).

### (3) The District Court's Analysis of Hedgepeth's Federal Claims Based on Arrest and Prosecution.

The district court properly analyzed Hedgepeth's claims for false arrest and malicious prosecution as Fourth Amendment claims for unreasonable seizure. (JA535-536). The court correctly reasoned that Ms. Webb could not be liable to Hedgepeth because: (a) a magistrate found probable cause and issued a warrant for her arrest; (b) she failed to show a genuine issue of fact that Ms. Webb "deliberately made material false statements or omitted material facts" with either intent to make or reckless disregard for making the warrant application misleading; (c) it was "speculative to infer a deliberate omission based upon other evidence in the record

regarding [Ms.] Webb's understanding of the differences between the two prior [administrative] hearings and her own fraud investigation," which understanding was consistent with other record evidence; and (d) Hedgepeth did not come forward with specific facts to dispute that a neutral magistrate issued the warrant based on substantiated fraud allegations. (JA536-539).

### (4) The District Court's Analysis of Hedgepeth's Procedural Due Process Claim.

Hedgepeth asserted that she was deprived of notice and an opportunity to be heard before her food stamp benefits were reduced. (JA541). The district court correctly rejected Hedgepeth's claim under controlling Fourth Circuit authority holding that food stamp recipients have a limited property interest, have no protected interest in continued receipt of food stamp benefits, and are not entitled to a "pre-termination evidentiary hearing" where they are given an opportunity to continue receiving the benefits through the recertification process. (JA541-542). Further, based on the evidence submitted to the district court, Hedgepeth failed "to demonstrate a genuine issue of material fact that she was deprived of a meaningful opportunity to be heard at an appropriate time." (JA543) (cleaned up).

### (5) The District Court's Analysis of Hedgepeth's Race and Sex Discrimination Claims.

Because Hedgepeth did not proffer any evidence on which the district court cold infer that "decisionmakers were motivated by race or sex" or "that she was

treated differently from others similarly situated," the district court properly granted summary judgment on her discrimination claims. (JA543). As the court noted, Hedgepeth's own testimony that "no one at NCDSS made any comments to [her] about her race or sex. . . coupled with the lack of any comparator evidence" was fatal to her discrimination claims. (JA543-544). Moreover, NCDSS was "tasked with determining eligibility for food stamp benefits and intentional program violations," so comments regarding Hedgepeth's lack of work, number of children, and absence of a mailbox would not support the conjectural inference of discrimination. (JA544).

### (6) The District Court's Analysis of Hedgepeth's *Monell* Claim.

The district court properly granted summary judgment on Hedgepeth's *Monell* claim for two reasons. First, there was no underlying constitutional violation by an individual on which *Monell* liability could be predicated, so the claim failed as a matter of law. (JA544) Second, Hedgepeth did not submit any evidence that Nash County had policies, customs, or a pattern of violations which deprived her of her rights. (JA544-545). Although Hedgepeth sought to create a negative inference that Nash County's policy regarding arrest warrants was improper based on alleged omissions in policy, she did not show the existence of a policy caused her any injury or that Nash County "continued inaction in the face of documented widespread abuses." (JA545) (citing Fourth Circuit authorities). Hedgepeth testified that she did not have knowledge of any other individuals who were arrested following an

investigation by NCDSS into food stamp fraud, so her reliance on an express policy or omission in policy could not sustain her *Monell* claim. (JA545)

### (7) The District Court's Analysis of Hedgepeth's State Law Claims.

Summary judgment was correctly granted to Nash County, Ms. Webb, and Ms. Reeves on each of Hedgepeth's state law claims.

### (a) Malicious Prosecution and Abuse of Process

The district court determined that there was probable cause for Hedgepeth's arrest and detention as a matter of law. (JA545). That probable cause precluded her state law malicious prosecution and abuse of process claims. (JA545)

### (b) Infliction of Emotional Distress

Hedgepeth did not present any evidence of "extreme and outrageous conduct" or a resulting "severe and disabling emotional or mental condition," which she was required to do to maintain any claim for emotional distress. (JA545-546). To the contrary, Ms. Webb obtained the warrant in the course of her occupational duties and Hedgepeth testified that neither she nor her children received any treatment or incurred any medical bills as a result of her arrest, and that she has never been diagnosed with a mental or emotional disorder. (JA546). The district court properly granted summary judgment on Hedgepeth's claims for intentional and negligent infliction of emotional distress. (JA546).

### (c) Public Official and Governmental Immunity

Besides her failure to raise a genuine issue of fact on the substantive elements of her claims, Hedgepeth also failed to provide any "evidence of 'malice' sufficient to overcome public official immunity" enjoyed by Ms. Reeves and Ms. Webb and governmental immunity enjoyed by Nash County. (JA546). Consequently, summary judgment was properly granted on all of Hedgepeth's claims. (JA546).

## SUMMARY OF THE ARGUMENT

Most of Hedgepeth's arguments revolve around her refusal to acknowledge and accept the distinction between administrative proceedings regarding eligibility and recertification for food stamps and Program Integrity Department investigations into referrals for alleged fraud related to programs for which NCDSS offered services, including food stamps. These arguments were properly rejected by the district court because: (1) Hedgepeth was afforded due process in connection with the recertification, reduction, and reinstatement of her monthly food stamp benefits; and (2) the separate Program Integrity investigation by Ms. Webb into reports of Hedgepeth's misrepresentations of her household composition and resulting income (which culminated in the issuance of a warrant for her arrest for food stamp fraud after a neutral magistrate determined the existence of probable cause) did not violate any of Hedgepeth's constitutional rights or otherwise give rise to liability under federal or North Carolina law.

## ARGUMENT AND CITATIONS OF AUTHORITY

### A. <u>Standard of Review</u>

Hedgepeth correctly identifies the *de novo* appellate standard of review of a district court's decision to grant summary judgment. (Appeal: 24-1638, Doc: 15, p. 30) (citing *Glynn v. EDO Corp.*, <u>710 F.3d 209, 213</u> (4th Cir. 2013)). However, Hedgepeth devotes a significant portion of her brief to misapprehending the summary judgment standard and mischaracterizing the district court's application of it. (*Id.* at pp. 42-46)

To be clear, "[t]here is no burden upon the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact. Rather, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Carr v. Deeds*, <u>453 F.3d 593, 608</u> (4th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, <u>477 U.S. 317, 325</u> (1986)) (cleaned up). Conversely, "the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [her] pleading, but must come forward with specific facts showing that there is a genuine issue for trial." *Emmett v. Johnson*, <u>532 F.3d 291, 297</u> (4th Cir. 2008) (cleaned up); *see also Francis v. Booz, Allen & Hamilton, Inc.*, <u>452 F.3d 299, 308</u> (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed

evidence indicates that the other party should win as a matter of law"). As the district court properly noted: "Only disputes between the parties that might affect the outcome of the case properly preclude the entry of summary judgment." (JA533-534) (citing *Anderson*, 477 U.S. at 247-48, for the "holding that a factual dispute is 'material' only if it might affect the outcome of the suit and 'genuine' only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party").

While Hedgepeth accurately notes that a district court considering a summary judgment motion views the evidence in the light most favorable to the non-movant and does not weigh evidence or make credibility determinations (Appeal: 24-1638, Doc: 15, p. 42), the district court did not run afoul of this standard in the present case despite Hedgepeth's allegations to the contrary. Indeed, the district court acknowledged that "at the summary judgment stage the court's function is not itself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" and that, in reaching that determination, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." (JA534) (cleaned up). However, as the district court also acknowledged, "permissible inferences must still be within the range of reasonable probability and it is the duty of the court to withdraw the case from the factfinder

when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." (JA534) (cleaned up).

All of Hedgepeth's accusations at the district court of "mak[ing] a credibility determination or simply ignor[ing] evidence contrary to its conclusion all together" (Appeal: 24-1638, Doc: 15, pp. 42-43) are contradicted by the undisputed facts, the actual record evidence, and the district court's explanation of its consideration of those facts and evidence. For example:

- Hedgepeth makes the inaccurate statement in support of her ☰*nell* claim that Ms. Reeves and Ms. Webb "admitted in their depositions to a practice or custom of prosecuting persons who come to them for governmental benefits" (*id.* at p. 43), when in fact Ms. Reeves testified there was not a goal to refer cases to Program Integrity for investigation and it was only done when a case worker received information that was not reported in the application process for eligibility to be determined. (JA213-215). She also testified that she was not familiar with the guidelines or procedures for how or when Program Integrity determined an arrest warrant should be issued, and there were no staff meetings regarding whether charges should be pressed. (JA221, JA223-224, JA248, JA285-286). Further, Ms. Webb testified that, although "there were quite a few cases that went to court," she "tried to stay out of court as much as possible" by trying "to give the client the opportunity to come in and

22

settle this without going to court." (JA334). Ms. Webb unequivocally stated: "Court was always the last resort. I felt like everybody deserved the benefit of the doubt." (JA334) It was also undisputed that Hedgepeth herself "does not know of any other instances where an individual was arrested for food stamp fraud based on an investigation by NCDSS." (JA545).

- Hedgepeth maintains that, with regard to the emotional distress claims and whether there was malice to overcome public official immunity, the district court should not have considered the testimony of Ms. Reeves and Ms. Webb with regard to the distinction between eligibility recertification and Program Integrity investigation of referrals, and the process by which Ms. Webb investigated information received from an anonymous caller, a retired officer of the North Carolina State Highway Patrol, and Hedgepeth's uncle that the father of two of her children resided in her home. (Appeal: 24-1638, Doc: 15, p. 44). Instead, according to Hedgepeth, the court should have allowed her to present to a jury her unsupported and speculative arguments that incomplete information was given to the magistrate and that "she was met with disdain and put through a sham investigation that only had one outcome: criminal prosecution." (*Id.*) However, the district court relied on Hedgepeth's own testimony in determining she did not present an issue of fact regarding the required elements of her emotional distress claims (*i.e.*, no facts supporting

extreme and outrageous conduct or resulting severe and disabling mental or emotional condition), and the same absence of facts precluded a finding of malice sufficient to overcome public official immunity. (JA545-546).

- Contrary to Hedgepeth's assertions that the district court ignored her testimony describing "the horror she felt when walking around with two felonies looming over her head," and the district court should have speculated as to "the horror a young and disabled child must feel to see her primary caregiver taken away in handcuffs" (Appeal: 24-1638, Doc: 15, p. 45), the district court expressly considered her testimony. Specifically, she testified that neither she nor her children sought medical treatment or incurred medical bills associated with this case and she was never diagnosed with any mental or emotional disorder. (JA128-130, JA545-546). There was nothing for a jury to decide because Hedgepeth's own testimony established that her claims failed as a matter of law.

- Hedgepeth accuses the district court of making "improbable assumptions, based on the evidence" in favor of Nash County, Ms. Webb, and Ms. Reeves (Appeal: 24-1638, Doc: 15, p. 45), when the district court actually explained why the inferences Hedgepeth asked the court to make were implausible, speculative, conjectural, tenuous, and/or precluded by undisputed facts and record evidence. (JA537-539, JA542-546).

- Finally, Hedgepeth cannot fault the district court for considering and relying on undisputed facts provided by Nash County, Ms. Webb, and Ms. Reeves in support of their summary judgment motion. The district court correctly held that where Hedgepeth, as the non-moving party, "did not file an opposing statement of material facts, each statement in defendants' statement of material fact "will be deemed admitted for purposes of the motion." (JA539) (quoting Local Civil Rule 56.1(a)(2)).

Culled of impermissible inferences, speculation, and conjecture, Hedgepeth's claims were fatally flawed, unsupported by record evidence and undisputed facts, and could not survive summary judgment for the reasons the district court explained.

**B.** **The district court correctly granted summary judgment on Hedgepeth's federal arrest and prosecution claims because there is no genuine issue of fact that Ms. Webb violated Hedgepeth's constitutional rights.**

The district court properly analyzed Hedgepeth's section 1983 claims for false arrest and malicious prosecution as Fourth Amendment claims for unreasonable seizure. (JA535-536) (quoting *Thurston v. Frye*, 99 F.4th 665, 673 (4th Cir. 2024) and *English v. Clarke*, 90 F.4th 636, 647 (4th Cir. 2024)). The first element of a section 1983 malicious prosecution claim requires that defendants "caused" the allegedly unlawful seizure. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). The intervening acts of a decision maker such as a magistrate can act as a superseding cause that breaks the causal chain and shields an investigating officer

from liability. *Id*. Here, a neutral magistrate was presented with a warrant supported by a thorough investigation and documentary evidence, and determined there was probable cause to believe that Hedgepeth committed food stamp fraud. That intervening act constitutes a superseding cause that breaks the causal chain and shields both Ms. Reeves and Ms. Webb from liability.

To challenge the veracity of Ms. Webb's warrant application, Hedgepeth would have to show that Ms. Webb "deliberately or with a reckless disregard for the truth made material false statements in the warrant application, or omitted from that application material facts with the intent to make, or with reckless disregard of whether they thereby made, the application misleading." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017). To show reckless disregard, Hedgepeth would have to establish that Ms. Webb made statements in the application "with a high degree of awareness of [their] probable falsity, meaning that when viewing all the evidence, [Ms. Webb] must have entertained serious doubts as to the truth of [her] statements or had obvious reasons to doubt the accuracy of the information [she] reported." *Id*.

Here, Ms. Webb received two reports (one from a retired officer of the North Carolina State Highway Patrol) regarding Mr. Brown, the father of two of Hedgepeth's children, residing in the home and receiving SSI income while not being included in the information provided to establish food stamp eligibility.

(JA434-435, JA514). Ms. Webb subsequently spoke with Hedgepeth's uncle, who confirmed Mr. Brown had been living with Hedgepeth for at least five years. (JA435, JA514). Ms. Webb requested information from the post office, and was provided verification that Hedgepeth and Mr. Brown received mail at the same address. (JA435, JA514). She also obtained information from the North Carolina Division of Motor Vehicles, Social Security Administration, Employment Security Administration, school systems, banks, and social media. (JA435). Hedgepeth did not cooperate in the investigation and declined to speak with Ms. Webb one-on-one. (JA435). She provided a letter purporting to be from GEICO to establish a different address for Mr. Brown, but a GEICO representative stated that the letter was not sent by GEICO and was not showing in their computer system. (JA174). After collecting enough evidence to substantiate the allegation that Mr. Brown resided with Hedgepeth and her children, Ms. Webb typed the relevant information into a criminal warrant for food stamp fraud and presented it to a magistrate who found probable cause and signed the warrant. (JA435). The foregoing negates any suggestion that Ms. Webb deliberately or recklessly made material false statements in a warrant application.

The crux of Hedgepeth's argument to the district court and here is that Ms. Webb wrongfully or recklessly omitted information from the warrant application. (Appeal: 24-1638, Doc: 15, pp. 30-38). "Omissions are made with reckless disregard

when the evidence demonstrates that [an] officer failed to inform the judicial officer of facts [she] knew would negate probable cause." *Humbert*, <u>866 F.3d at 556</u>.

Hedgepeth baldly asserts that Ms. Webb withheld the outcomes of the NCDHHS eligibility hearings from the magistrate because she knew he would not issue a warrant if she disclosed them (Appeal: 24-1638, Doc: 15, 35) and, despite direct evidence to the contrary, continues to insinuate those hearings had already adjudicated the same issue (*i.e.*, whether Hedgepeth committed food stamp fraud). (*Id.* at p. 36-37) (stating "there were two agency hearings in which [Hedgepeth] was exonerated" and suggesting Ms. Webb misled the magistrate "by withholding exculpatory information" until after the warrant was issued).

In reality, the hearing officers' decisions in no way related to the pending fraud investigation that was still actively being conducted by Ms. Webb. (<u>JA198-200</u>). The issue at the appeal hearings related solely to whether Hedgepeth "lived with the father of her children and his income should be counted in the household income for Food and Nutrition Services (FNS) benefits." (<u>JA198</u>). Each of the regulations cited by the State Hearing Officer refer to Plaintiff's *eligibility* for benefits. (<u>JA199</u>). The decision was limited to the issue of whether Hedgepeth's benefits should have been reduced, which is underscored by the State Hearing Officer's conclusion that NCDSS' decision to reduce those benefits was not supported by the evidence. (<u>JA200</u>). As Ms. Webb testified, "The food stamp

hearing and program integrity are two different things," she did not include the hearings in the warrant application "[b]ecause it had nothing to do with the program integrity investigation," and the food stamp hearings were to determine eligibility, not whether Hedgepeth had committed fraud. (JA348).

Based on the foregoing, the district court correctly reasoned that Ms. Webb could not be liable to Hedgepeth because: (a) a magistrate issued a warrant for her arrest based on probable cause; (b) she failed to show a genuine issue of fact that Ms. Webb "deliberately made material false statements or omitted material facts" with either intent to make or reckless disregard for making the warrant application misleading; (c) it was "speculative to infer a deliberate omission based upon other evidence in the record regarding [Ms.] Webb's understanding of the differences between the two prior [administrative] hearings and her own fraud investigation," which understanding was consistent with other record evidence; and (d) Hedgepeth did not come forward with specific facts to dispute that a neutral magistrate issued the warrant based on substantiated fraud allegations. (JA536-539). This Court should affirm.

C. **The district court properly dismissed federal arrest and prosecution claims against Ms. Reeves as a matter of law.**

For the same reasons discussed above in connection with the grant of summary judgment on the federal arrest and prosecution claims against Ms. Webb, the district court also correctly concluded Hedgepeth "has not demonstrated a federal

claim for malicious prosecution or false arrest against [Ms.] Reeves." (JA540). In addition, the district court correctly held the "claims against [Ms.] Reeves must be dismissed as a matter of law because she is not alleged to have been personally involved in the decision to seek a warrant for plaintiff's arrest." (JA540) (citing JA223) ("I don't know how or what they, Program Integrity, did, when they issued a warrant and when they didn't"; "I wouldn't know about a warrant or anything until after"); *see also* (JA224) ("But as far as when she would issue a warrant, . . . that was a totally different department. We would do the referrals. And as far as the warrants or how they determined that, I don't know").

### D. <u>The district court correctly held Ms. Webb had qualified immunity from Hedgepeth's federal arrest and prosecution claims because Hedgepeth did not establish violation of a clearly established right</u>.

Hedgepeth did not provide any evidence that Ms. Webb violated a clearly established right, and therefore the district court correctly held she is entitled to qualified immunity. (JA540) (citing *Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017). On appeal, Hedgepeth argues the district court's decision was based on "the improper application of *Miller v. Prince George's Cnty.*, 475 F.3d 621, 631 (4th Cir. 2007) and *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017)," and their "progeny." (Appeal: 24-1638, Doc: 15, p. 12). However, the district court correctly noted, quoting *Safar*, 859 F.3d at 246, that: "Before concluding that an officer has breached a clearly established right," the court "must

identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." (JA540). The court then explained that Hedgepeth failed to identify such a case because neither *Miller* nor *Humbert* "involved circumstances, as here, where an officer's alleged warrant affidavit asserted facts as reflected in her own investigative files, and the plaintiff's claim was based on determinations made in prior administrative proceedings." (JA540)

Instead, the plaintiff in *Miller* proffered evidence at summary judgment that the detective seeking the arrest warrant: (1) "intentionally listed Plaintiff's birthdate, height, weight, driver's license number and vehicle tag number as those of a white man suspected of committing the burglary," when he knew "that this information identified the Plaintiff, an African–American man never suspected of committing the burglary"; (2) intentionally omitted his source of the information "never stating that all of this information was obtained from the computer records of an African–American, who could not be the white suspect"; (3) deliberately misrepresented that an eyewitness supplied the license plate tag number when he actually got it from the plaintiff's computer records "and had established no link between that number and the getaway car or the white suspect"; and (4) deliberately omitted "the fact that he had searched the state criminal database for a white male with Plaintiff's birthdate and retrieved *no* match." *Miller*, 475 F.3d at 628 (emphasis in original).

The facts in *Humbert* were even more egregious than *Miller* because the investigating officers manipulated a rape victim's participation in a composite sketch of her attacker, then arrested the plaintiff based off a flyer generated from that sketch. 866 F.3d at 551–52. After the unlawful arrest, "the officers failed to inform the State's Attorney that the victim [had told them she] could not positively identify [the plaintiff] and that DNA reports excluded him as a suspect." *Id.* at 550.

On appeal, Hedgepeth continues her efforts to shoehorn the vastly different circumstances here into the holdings against qualified immunity in *Miller* and *Humbert* (Appeal: 24-1638, Doc: 15, pp. 31-36), and further cites *Harris v. Town of S. Pines*, 110 F.4th 633 (4th Cir. 2024), for the broad proposition that "this Court held that officers could not mislead prosecutors by withholding exculpatory information until after the suspect was indicted, and as such the officers were not entitled to qualified immunity and the district court erred in granting summary judgment to the officers on the Fourth Amendment malicious prosecution claim." (Appeal: 24-1638, Doc: 15, p. 37).

Similar to her reliance on *Miller* and *Humbert*, however, Hedgepeth fails to discuss the factual distinctions between the actions of the officers in *Harris* and those of Ms. Webb in the instant case. Most notably, in *Harris*, there were genuine issues of material fact as to whether the plaintiff was properly arrested and charged with possession of cocaine with intent to distribute during the execution of a search

warrant based on surveillance notes and footage obtained during a lengthy investigation into a number of other individuals suspected of drug activity, including the plaintiff's son. *See generally* 110 F.4th at 635-641. Unlike the situation here, where Ms. Webb's investigative file documented the information she presented to the magistrate in the warrant application, the investigation notes and footage relied on by the officers in *Harris* raised serious concerns as to whether the officers could have reasonably believed the plaintiff was involved in the drug activity about which his son was under investigation.

As such, Hedgepeth continues to be unable to identify any analogous case where someone in Ms. Webb's position acted under similar circumstances and was found to have violated the Fourth Amendment and stripped of qualified immunity. The district court's holding should be affirmed.

E. **The district court correctly granted summary judgment on Hedgepeth's procedural due process claims because she failed to demonstrate a genuine issue of fact that she was deprived of a meaningful opportunity to be heard at an appropriate time.**

It is undisputed that the issue regarding Hedgepeth's eligibility for food stamps arose during the recertification process. (JA272). Ms. Webb received an anonymous suspected fraud referral stating that, while Hedgepeth was reporting to NCDSS that she and her children lived with her mother in Nashville, they were actually living with Mr. Brown in Hollister for the past five years and that Mr. Brown received income. (JA444). Ms. Webb noted that if Mr. Brown was living in the

home, he would need to be included in the assistance unit and his income would need to be counted. (JA444) Hedgepeth was notified of the issue and the need for resolution, but she and her mother were uncooperative with requests for verification in connection with recertification, additional information was obtained indicating Hedgepeth and Mr. Brown resided together, and therefore Mr. Brown's income was included in the benefits calculation. (JA272-273, JA304, JA306-307).

Hedgepeth relies heavily on *Goldberg v. Kelly*, 397 U.S. 254, 261 (1970), for the proposition that she was entitled to a hearing prior to reduction of her food stamp benefits based on Mr. Brown's income. However, as the district court correctly explained, this Circuit "has 'effectively distinguished the due process rights of food stamp recipients from those individuals in cases such as *Goldberg*, who received welfare benefits unlimited by any statutory duration period.'" (JA541) (quoting *Holman v. Block*, 823 F.2d 56, 59 (4th Cir. 1987)).

"The Food Stamp Program created by the Food Stamp Act of 1964, as amended, 7 U.S.C. §§ 2011 et seq. is a joint federal-state effort whereby qualified low income households receive financial assistance in the form of food stamps." *Holman*, 823 F.2d at 57. Controlling regulations require food stamp applicants to provide income verification and have one household member appear for a personal interview to determine eligibility, after which eligible households can be certified to receive benefits for a specified period of time. *Id.* After that, the state agency must

notify the household when eligibility is about to expire that recertification is required so that timely reapplication can allow for uninterrupted benefits if the household is recertified. *Id.* "An applicant who is denied recertification may request a hearing, but benefits terminate at the end of the certification period regardless of the pendency of such a hearing." *Id*. at 57-58. "Accordingly, the property interest of the recipients of food stamps is of a limited nature." (JA541) (quoting *Holman*, 823 F.2d at 59).

This is precisely the process that was afforded to Hedgepeth, and her food stamp benefits were never terminated. Rather, she was recertified and given notice of the determination that Mr. Brown resided with her, and his income therefore decreased the amount of benefits she would receive. (JA198). Hedgepeth then exercised her right to appeal that determination. (JA199).

The process was entirely consistent with the holding in *Holman*. Like Hedgepeth, the plaintiffs in *Holman* initially failed to fully cooperate with the recertification process. 823 F.2d at 58. Once they reapplied and cooperated, the plaintiffs were certified on an expedited basis and received retroactive benefits. *Id.* Nevertheless, they sought an administrative hearing to contest the interruption of benefits for a three-week period, and when the state agency's actions were upheld as proper, they filed suit and alleged a due process violation. *Id.* Like the district court in this case, "[t]he court concluded that the notice of expiration and the opportunity for a recertification interview satisfied the requirements of due process."

*Id.*; *see* (JA542-543). This Court affirmed the district court's holding in *Holman*, and should also affirm the district court in this case.[1]

> **F. The district court correctly granted summary judgment on Hedgepeth's race and sex discrimination claims because she offered no evidence that decisionmakers were motivated by race or sex or that she was treated different that similarly situated individuals.**

Although Hedgepeth does not include race and sex discrimination claims in her statement of the issues in her appeal brief or present any argument as to why the district court's grant of summary judgment on those claims was not proper, she does discuss the arguments presented to the district court and includes the court's decision on those claims in the "Procedural History and Relevant Rulings" section of her

---

[1] This result is not altered by Hedgepeth's curious reliance on *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722-23 (4th Cir. 2019), for the proposition that the district court should have determined or submitted to a jury the question of whether Hedgepeth "was put through a sham process in which only one outcome was possible" because the district court "must assume that the testimony in favor of plaintiffs was credible, unless totally incredible on its face, and ignore evidence to rebut it." *Westmoreland* is a wholly inapposite case involving a defendant's appeal of the district court's denial of its motion for judgment as a matter of law after a three-day trial resulted in a jury verdict in the plaintiff's favor on an age discrimination claim. 924 F.3d at 722. The case has no bearing on the district court's decision that Hedgepeth was afforded due process, particularly where the administrative hearing officer did consider and give weight to witness testimony supporting Hedgepeth's challenge to the reduction of her benefits and resolved the matter in her favor. (JA198, JA200).

brief. (Appeal: 24-1638, Doc: 15, pp. 23-28).[2] To the extent Hedgepeth has not abandoned those claims, this Court should affirm the district court's rulings on them.

In the summary judgment context, "when the defendant has pointed to the absence of evidence of discriminatory intent, it becomes the plaintiffs' job to produce such evidence." *Our Children v. School Bd. of Broward Cnty., Fla.*, 193 F.3d 1285, 1294–95 (11th Cir. 1999). Hedgepeth did not identify any record evidence of race or sex discrimination in response to the summary judgment motion of Nash County, Ms. Reeves, and Ms. Webb.

Rather, Hedgepeth testified to her belief that her "race became an issue" and Ms. Webb's "attitude" changed when she saw Hedgepeth in person (and presumably realized Hedgepeth is a woman of color), when she found out about Mr. Brown's race, and when she saw Hedgepeth's "mixed kids." (JA123-124). However, Hedgepeth also testified that Ms. Webb never made any comments to her about her race or Mr. Brown's race. (JA124). No one at NCDSS made any comments to Hedgepeth about her race, and she does not know of any incidents where anyone at NCDSS discriminated against anyone on the basis of race. (JA124-125).

_____

[2] Hedgepeth's Docketing Statement did include "Procedural issues; and Race discrimination" in her non-binding statement of issues on appeal (Appeal: 24-1638, Doc: 6, p. 3), and included the following sentence in her description of the Nature of Case: "Hedgepeth is a single Black mother of three (Defendants have unilaterally decided to declare that she is Indian, and not a "real" Black), one of whom has Downs Syndrome." (*Id.* at p. 2).

Further, Hedgepeth's only justification for claiming Ms. Webb discriminated against her based on her sex was: "Because I feel like that she was trying to have, like that male type of authority mind frame with me." (JA124). Yet, Ms. Webb never made any comments to Hedgepeth about being a woman, nor did anyone else at NCDSS. (JA125). Hedgepeth does not believe that anyone else at NCDSS discriminated against her on the basis of her sex and she does not know of any instances in which anyone at NCDSS has discriminated against anyone on the basis the person's sex. (JA125)

Other than Hedgepeth's subjective belief that her race became "an issue" for Ms. Webb, and her assumption that she was "stereotyped" for not working, living in an impoverished area, and having multiple children (JA471), she offered no facts or evidence of race or sex discrimination to support her claims. This Circuit has held that such bare allegations as those made by Hedgepeth are not even sufficient to withstand a Rule 12(b)(6) motion, *see McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.,* 780 F.3d 582, 585–86 (4th Cir. 2015), so the district court could not have erred in holding Hedgepeth's claims could not withstand summary judgment scrutiny. (JA544) (holding summary judgment must be granted because Hedgepeth's inference of discrimination was "so tenuous that it rests merely upon speculation and conjecture") (quoting *Lovelace,* 681 F.2d at 241).

### G. **The district court correctly granted summary judgment to Nash County on Hedgepeth's *Monell* claim because there was no underlying constitutional violation and no evidence of policies, customs, or a pattern of violations which deprived her of her rights.**

It is well-settled that a local government entity, like Nash County, cannot be held liable under section 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Rather, to establish liability, a plaintiff must show that: (1) a government actor deprived the plaintiff of her federal rights; and (2) the harm resulted from municipal policy or custom. *Id*. Hedgepeth failed to establish that Ms. Reeves or Ms. Webb violated her rights, and failed to identify any policy, custom, practice, or pattern of Nash County to deprive citizens of constitutionally protected rights.

To show Nash County violated her federal rights, Hedgepeth was required to establish: (1) an express policy that, when enforced, caused a constitutional violation; (2) a widespread practice that is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *McTique v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Hedgepeth offered only generalized allegations that Nash County allowed social workers to pursue criminal charges without adequate process, but failed to proffer evidence of the existence of either a formal policy or a widespread, longstanding practice of pursuing unwarranted criminal charges.

At the summary judgment stage, Hedgepeth was required to offer more than isolated incidents of constitutional deprivation. *Gustafson v. Jones*, 117 F.3d 1015, 1022 (7th Cir. 1997). She could not even offer any purported incidents other than her own experience. Moreover, Hedgepeth could not make the required showing "that the municipal action was taken with the requisite degree of culpability" and could not "demonstrate a causal link between the municipal action and the deprivation of federal rights." *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).

Thus, the district court correctly held that Nash County was entitled to summary judgment with respect to Hedgepeth's federal claims where: (1) there was no underlying constitutional violation by an individual on which *Monell* liability could be predicated, so the claim failed as a matter of law (JA544); and (2) Hedgepeth did not submit any evidence that Nash County had policies, customs, or a pattern of violations which deprived her of her rights or constituted "continued inaction in the face of documented widespread abuses." (JA544-545). This Court should affirm.

**H.**  **The district court correctly granted summary judgment on Hedgepeth's state law malicious prosecution and abuse of process claims because there was probable cause for her arrest.**

For all the reasons discussed *supra.*, the district court properly held that probable cause existed for the magistrate to issue a warrant for Hedgepeth's arrest.

"Because there was, as a matter of law, probable cause for [the] arrest and detention, [the] state law malicious prosecution claim fails as well." *Durham v. Horner*, <u>690 F.3d 183, 190</u> (4th Cir. 2012); *see also Quarles v. Weeks,* <u>815 F. App'x 735, 738</u> (4th Cir. 2020) (applying North Carolina law and determining existence of probable cause for arrest rendered state law claim for malicious prosecution meritless).

Likewise, that probable cause was fatal to Hedgepeth's state law abuse of process claim. To recover on that claim, Hedgepeth was required to demonstrate both "the existence of an ulterior purpose" and "an act in the use of the process not proper in the regular prosecution of the proceeding." *Beroth Oil Co. v. Whiteheart*, <u>173 N.C. App. 89, 99-100</u>, <u>618 S.E.2d 739, 747</u> (2005) (citing *Barnette v. Woody*, <u>242 N.C. 424, 431</u>, <u>88 S.E.2d 223, 227</u>–28 (1955)). Stated another way: "One who uses *legal process* to compel a person to do some collateral act not within the scope of the process or for the purpose of oppression or annoyance is liable in damages in a common law action for abuse of process." *Fowle v. Fowle*, <u>263 N.C. 724, 727</u>, <u>140 S.E.2d 398, 401</u> (1965) (emphasis in original).

Leaving aside Hedgepeth's complete failure to come forward with an ulterior motive by Ms. Webb (who in fact was merely performing the prescribed duties of her job as a fraud investigator), Hedgepeth could not make the required showing that Ms. Webb "committed some willful act whereby [she] sought to use the proceeding as a vehicle to gain advantage of [Hedgepeth] in respect to some collateral matter."

*Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985). The magistrate found probable cause to issue a warrant for Hedgepeth's arrest based on the evidence developed during the course of Ms. Webb's investigation and she was subsequently arrested in accordance with that warrant. Thus, the district court correctly concluded that the act of pursuing a criminal charge supported by probable cause cannot "establish that use of the process was not proper in the regular prosecution of the proceeding." (JA545) (citing *Barnette*, 242 N.C. at 431) (cleaned up). This Court should affirm.

I. **The district court correctly granted summary judgment on Hedgepeth's intentional and negligent infliction of emotional distress claims because she offered no evidence of extreme or outrageous conduct, resulting damages, or malice sufficient to overcome public official immunity.**

The district court correctly identified three distinct substantive reasons that Hedgepeth's emotional distress claims failed as a matter of law:[3] (1) Hedgepeth failed to identify any "extreme and outrageous conduct" (JA546); (2) Hedgepeth failed to establish a causal link between conduct and damages (or present any evidence of damages at all) (JA545-546); and (3) Hedgepeth failed to present

---

[3] The district court identified substantive reasons which would defeat claims based on either intentional or negligent infliction of emotional distress, and did not reach the additional reason for dismissing the negligent infliction claim, which is that "inherently intentional conduct cannot support a claim for negligent infliction of emotional distress." *Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F.Supp.2d 533, 545 (E.D.N.C. 2008). All of Hedgepeth's allegations involved Ms. Webb's intentional performance of her job duties.

evidence of "malice" that would overcome the public official immunity of Ms. Reeves and Ms. Webb. (JA546).

To recover on an intentional infliction of emotional distress claim under North Carolina law, Hedgepeth was required to show "(1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." *Bratcher*, 545 F. Supp. 2d at 544 (quoting *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) and *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)).

Hedgepeth did not proffer any evidence of conduct rising to the level of extreme or outrageous, and the district court correctly reasoned that the first element of her emotional distress claim could not be met "in light of the court's determination that defendant Webb secured the arrest warrant on the basis of probable cause in the course of her duties." (JA546). The failure of this element alone justifies summary judgment. *See Waddle*, 331 N.C. at 83 (finding where plaintiff "failed to produce a sufficient forecast of evidence on [an] essential element of her claim," the court need not address remaining elements).

Additionally, however, the district court correctly held that Hedgepeth did not come forward with any evidence showing any of the conduct she complained of caused a "severe and disabling emotional or mental condition." (JA545) (citing *Waddle*). On this element, Hedgepeth's own testimony was fatal to her claim

because Hedgepeth testified that neither she nor her children received any treatment or incurred any medical bills as a result of her arrest, and that she has never been diagnosed with a mental or emotional disorder. (JA545-546); *see* (JA128-130). This testimony eclipses Hedgepeth's suggestion on appeal that the district court should have found an issue of fact based on her description of "the horror she felt when walking around with two felonies looming over her head," and speculation regarding "the horror a young and disabled child must feel to see her primary caregiver taken away in handcuffs" (an issue about which no direct evidence was presented) (Appeal: 24-1638, Doc: 15, p. 45)

Finally, "in the alternative and for the same reason" Hedgepeth could not demonstrate extreme or outrageous conduct by Ms. Reeves or Ms. Webb, the district court held Hedgepeth failed to offer evidence of the necessary malice to overcome their public official immunity. (JA546) (citing *R.A. v. Johnson*, 36 F.4th 537, 545 (4th Cir. 2022), for the "holding mere reckless indifference is insufficient to overcome public official immunity") (cleaned up).[4]

---

[4] The district court also properly held that Nash County is entitled to governmental immunity with respect to Hedgepeth's state law claims (JA546), which Hedgepeth now concedes. (Appeal: 24-1638, Doc: 15, p. 46 n.1) ("Appellant does not contest that the County is immune from liability of state law claims based on their insurance policy").

# CONCLUSION

Hedgepeth bears the burden of establishing each element of her claims. The district court considered the undisputed facts and the record evidence, and provided a reasoned explanation of why those facts and evidence demonstrated Hedgepeth's failure to raise a genuine issue of material fact for trial. It follows that the district court correctly determined that Nash County, Ms. Webb, and Ms. Reeves were entitled to judgment as a matter of law on each of Hedgepeth's claims. The district court's well-reasoned grant of summary judgment should therefore be affirmed.

# STATEMENT REGARDING ORAL ARGUMENT

Nash County, Ms. Webb, and Ms. Reeves do not request oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. Fed. R. App. P. 34(a)(2)(C).

This 20th day of September, 2024.

*(signature page to follow)*

/s/ *Sonny S. Haynes*

N.C. State Bar No. 41303
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC  27101
Telephone: (336) 721-3632
Facsimile: (336) 726-2227
Email: Sonny.Haynes@wbd-us.com

/s/ *Nikole M. Crow*

GA State Bar No. 198359
WOMBLE BOND DICKINSON (US) LLP
1331 Spring Street, N.W., Suite 1400
Atlanta GA 30363-1017
Telephone (404) 962-7533
Fax (404) 870-8233
Email Nikole.Crow@wbd-us.com

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I, Nikole M. Crow, as attorney for Defendants-Appellees, do hereby certify that the entire brief submitted herein (excluding the corporate disclosure form) contains 10,010 words and that the same complies with Fed. R. App. P. 32(a)(7)(B)(i).

This 20th day of September, 2024.

/s/ *Nikole M. Crow*
GA State Bar No. 198359
WOMBLE BOND DICKINSON (US) LLP
1331 Spring Street, N.W., Suite 1400
Atlanta GA 30363-1017
Telephone (404) 962-7533
Fax (404) 870-8233
Email Nikole.Crow@wbd-us.com

*Counsel for Defendants-Appellees*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 20th day of September, 2024, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Sharika Monique Robinson
10230 Berkeley Place Drive, Suite 220
Charlotte, North Carolina  28262
(704) 561-6771
srobinson@sharikamrobinsonlaw.com

*Counsel for Appellant*

/s/ *Nikole M. Crow*
GA State Bar No. 198359